UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

| | | | |
|---|---|---|---|
| **CASE NO.:** | EDCV 13-00199 SJO (OPx) | **DATE:** | December 16, 2014 |
| **TITLE:** | Chicago Male Medical Clinic, LLC v. Ultimate Management, Inc. et al. | | |

========================================================================
**PRESENT:** THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Victor Paul Cruz
Courtroom Clerk

Not Present
Court Reporter

**COUNSEL PRESENT FOR PLAINTIFF:**

Not Present

**COUNSEL PRESENT FOR DEFENDANTS:**

Not Present

========================================================================
**PROCEEDINGS (in chambers): FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter comes before the Court for Findings of Fact and Conclusions of Law following a court trial. After carefully considering the testimony and arguments raised in court and reviewing the papers submitted by the parties, it is ORDERED, ADJUDGED and DECREED that Judgment is entered in favor of Plaintiff in the sum of $356,251.92 plus costs and attorney's fees to be determined in a post-trial motion.

I.    PROCEDURAL HISTORY

This action was originally filed in the Circuit Court of Cook County, Illinois, on August 15, 2011. On July 13, 2012, Defendants Ultimate Management Inc. ("UMI") and Jeffrey Fromberg ("Fromberg") (collectively, "Defendants") filed a Notice of Removal in U.S. District Court for the Northern District of Illinois. On August 7, 2012, Defendants filed an Amended Notice of Removal. Subsequently, Defendants filed a Motion to Dismiss, Plaintiff Chicago Male Medical Clinic, LLC ("CMMC" or "Plaintiff") filed a Motion for Summary Judgment, and Defendants filed a Motion to Transfer the case to the Central District of California. On December 28, 2012, Judge Leinenweber of the Northern District of Illinois issued an order granting in part Defendants' Motion to Dismiss, denying Plaintiff's Motion for Summary Judgment, and transferring the case to the Central District of California. On January 31, 2013, Plaintiff filed its Second Amended Complaint. A court trial was held beginning on November 19, 2014, and concluding on December 5, 2014.

II.    FINDINGS OF FACT

At trial, the following witnesses were called:

| **Plaintiff's Witnesses** | **Defendant's Witnesses** |
|---|---|
| Todd Wheatcraft | Roy Castner |
| Bruce Shapiro | Randy Cassell |
| Jeff Bertoncino | Jeffrey Fromberg |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority \_\_\_\_
Send \_\_\_\_
Enter \_\_\_\_
Closed \_\_\_\_
JS-5/JS-6 \_\_\_\_
Scan Only \_\_\_\_

CASE NO.: <u>EDCV 13-00199 SJO (OPx)</u>   DATE: <u>December 16, 2014</u>

Kevin Reid, CPA
Mark Edelstein

At trial, the following exhibits were admitted into evidence:

| | |
|---|---|
| Ex. 501 | NMMC Franchise Disclosure Document |
| Ex. 502 | Continuing Compensation and Consulting Agreement |
| Ex. 503 | National Male Medical Clinics Website - Screen shot for Chicago, Illinois page, taken on August 15, 2011 |
| Ex. 504 | First Amended Complaint with Exhibits |
| Ex. 506 | 10.25.10 Email from Jeffrey Fromberg to Todd Wheatcraft re: Proforma |
| Ex. 508 | License Agreement with Mike Ditka whereby Ditka allowed CMMC to use his name and likeness for clinic advertising |
| Ex. 517 | Photograph of a Binder labeled "Ty's Book 6-1" |
| Ex. 525 | July 26, 2011 demand letter to Jeffrey E. Fromberg from Carmen Caruso |
| Ex. 535 | Advertising Symbols for National Male Medical Clinic, Los Angeles Male Medical Clinic, and Chicago Male Medical Clinic (UMI 548-553) |
| Ex. 536 | CMMC damage calculation prepared by Kevin Reid, CPA |
| Ex. 542 | CMMC, LLC 2011 Statement of assets and liabilities |
| Ex. 543 | CMMC, LLC Statement of assets and liabilities (ending July 2012) |
| Ex. 544 | CMMC at Vernon Hills, LLC Statement of assets and liabilities (ending July 2012) |
| Ex. 550 | September 24, 2010 correspondence form Jeffrey Fromberg to CMMC members regarding formation and waiver of conflict of interest |
| Ex. 552 | January 13, 2011 statement from Steve Mandell regarding authority to use Mike Ditka's likeness |
| Ex. 559 | CMMC, LLC — File Detail Report from Illinois Secretary of State Webpage |

Based on the testimony and exhibits presented, the Court makes the following findings of fact.

    A.    <u>Findings Concerning Stipulated Facts</u>

The following facts have been admitted.  (*See* Final Pretrial Conference Order ("FPCO") ¶ 5.)

1. Plaintiff CMMC is an Illinois limited liability company that, at the time this case was filed, had its principal place of business in Chicago, Illinois.  (FPCO ¶ 5(a).)

2. Defendant Ultimate Management, Inc. ("UMI") is a California corporation that, at all times since its inception, had its principal place of business at 2825 East Tahquitz Canyon Way, Suite D-1, Palm Springs, CA 92262.  (FPCO ¶ 5(b).)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.: **EDCV 13-00199 SJO (OPx)**        DATE: **December 16, 2014**

3.  Defendant Jeffrey E. Fromberg is an individual officer, director and shareholder of UMI, and a resident of the State of California. (FPCO ¶ 5(c).)

4.  On or about November 3, 2010, CMMC executed a written contract with UMI entitled "Continuing Consultation and Compensation Agreement" ("Consulting Agreement"), shown in Exhibit 502 and incorporated by reference as if fully set forth here. (FPCO ¶¶ 5(c)-5(d).)

5.  At the time the Consulting Agreement was negotiated, Jeffrey Fromberg was, on his own behalf, applying for protection of a trademark, National Male Medical Clinics. (FPCO ¶ 5(f).) By the time the Consulting Agreement was executed, several months later, Jeffrey Fromberg personally had acquired and owned the National Male Medical Clinic trademark ("NMMC"). (FPCO ¶ 5(f).) It was first utilized on the Internet website in fall of 2010, having just been filed. (FPCO ¶ 5(f).)

6.  UMI's web site included the full name and logo that Defendant Fromberg had registered with the United States Patent & Trademark Office from and after on or about August, 2010. (FPCO ¶ 5(g).) Defendants intended to associate each clinic owned all or in part by Fromberg with the trademark. (FPCO ¶ 5(g).) Initially, the trademark's appearance on the web site was for the following clinics: Dallas, Hawaii, Indianapolis, Los Angeles, Orange County, Miami, Nashville, Rancho Mirage, and Seattle. (FPCO ¶ 5(g).) Hawaii was subsequently removed when it set up its own website. (FPCO ¶ 5(g).)

7.  The Consulting Agreement required CMMC to pay "an initial fee or set up fee." (FPCO ¶ 5(h).) This "Set Up Fee" consisted of a $300,000 initial cash payment, plus "Time Payment Portions of the Set Up Fee" equal to ten percent of the daily gross revenues of CMMC's clinic operations, although this percentage was later reduced to "6.5 percent." (FPCO ¶ 5(g).)

8.  CMMC paid fees to UMI in excess of $500.00. (FPCO ¶ 5(i).)

9.  Prior to the execution of the Consulting Agreement, Defendants did not register any franchise with the Illinois Attorney General's Office. (FPCO ¶ 5(j).)

10. Prior to the execution of the Consulting Agreement, and prior to its acceptance of the payment of fees by the Plaintiff, UMI did not provide Plaintiff with a disclosure document as defined in the Illinois Franchise Disclosure Act. (FPCO ¶ 5(k).)

11. A NMMC franchise disclosure document was issued on May 1, 2012. (FPCO ¶ 5(l).)

12. UMI gave CMMC a document entitled "CHICAGO MALE MEDICAL CENTER, LLC (Proforma) Fiscal Year 12-1-10 to 11-30-11" (the "Pro Forma"). (FPCO ¶ 5(m).)

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** EDCV 13-00199 SJO (OPx)          **DATE:** December 16, 2014

13.  UMI prepared this Pro Forma and delivered it to CMMC as an attachment to an email sent by Fromberg to CMMC on October 25, 2010, shown in Exhibit 506. (FPCO ¶ 5(n).)

14.  The pro forma did not include the dates on which this data from the Los Angeles clinic was taken. (FPCO ¶ 5(o).)

    B.    <u>Findings Concerning Contested Facts</u>

15.  Under the Consulting Agreement, UMI suggested a marketing plan or system for use by CMMC.

16.  UMI's suggested marketing plan included telephone training for incoming calls, suggested newspaper, magazine, circular, and radio ads, text for effective window signing, information and aid in setting up toll free telephone numbers, call center services, and other suggested marketing plans.

17.  UMI agreed to provide CMMC with their know-how and experience in advertising and marketing with respect to erectile dysfunction and related medical services.

18.  CMMC paid the "initial fee or set up fee" of $300,000 to UMI under the Consulting Agreement, and additionally made payments to UMI under the "Time Payment" provisions.

19.  After the consulting agreement was signed and as a result of that agreement, UMI gave CMMC permission to use the NMMC trademark.

20.  After the consulting agreement was signed and as a result of that agreement, UMI added CMMC to the NMMC webpage – and CMMC's Chicago clinic was displayed on this web page in the same manner as the clinics that Fromberg owned in whole or in part. To anyone looking at the NMMC webpage, CMMC was part of the national NMMC brand.

21.  CMMC used a caduceus logo and type based on the NMMC trademark in CMMC's advertisements, and this logo was supplied to CMMC by UMI. This logo used the same font, styling, and the same caduceus symbol in the same positioning as the logos of NMMC and Los Angeles Male Medical Clinic. (Ex. 535.)

22.  The Consulting Agreement notes that employees might visit the "affiliated Los Angeles clinic", states that UMI is to provide suggested newspaper, magazine, circular, and radio advertising and assist in the negotiation of media contracts for CMMC, states that UMI is to provide text for effective window signing (Consulting Agreement 3), and provides for the use of a centralized call center for advertising to potential customers (Consulting Agreement 4).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.: **EDCV 13-00199 SJO (OPx)**        DATE: **December 16, 2014**

23. In exchange for CMMC's payments to UMI under the Consulting Agreement, CMMC received the right to engage in the National Male Medical Clinic business.

24. Todd Wheatcraft and Bruce Shapiro did not know in 2010 that the Consulting Agreement was in violation of the Illinois Franchise Disclosure Act.

25. Under the Consulting Agreement, CMMC paid UMI a $300,000 initial investment, plus royalties of $56,251.92 and call center fees of $45.437.50.

26. The Consulting Agreement did not bind Plaintiff to use UMI's call center.

27. CMMC's current members, Bruce Shapiro, Todd Wheatcraft, Jeff Bertoncino and John Muno, all had personal experience in owning and operating sophisticated businesses long before entering into any negotiations with UMI.

28. The CMMC Operating Agreement states, in part, as follows: "10.18 Member Representations. Member: . . . (iii) understands the business in which the company is engaged and represents and warrants to the Manager(s) and the Company, based upon Member's knowledge and experience in financial and business matters, that Member is familiar with investments of the sort that Member is undertaking herein, that Member is fully aware of the problems and risks involved in making an investment of this type, and that Investor is capable of evaluating the merits and risks of this investment; (iv) has previously made such inquiry into the structure and operations of the Company as Member and Member's advisors have thought necessary is prudent in the circumstances; (v) represents and warrants to the Manager(s) and the Company that Member's financial circumstances are such that Member can bear the economic risk of the proposed investment in the Capital Contributions for an indefinite period of time and can afford to sustain a complete loss with respect to the Capital Contributions; . . . ."

29. Mr. Shapiro is a commercial real estate developer. He has approximately 2 Million square feet of property under management, has negotiated over 50 leases, and has developed multi- million- dollar commercial projects, such as shopping malls with tenants that include franchisees of Subway and Jack-in-the-Box.

30. Mr. Wheatcraft was a partner in a business with Jeff Bertoncino and Fred Martori (who was initially a member of CMMC, LLC), and Mr. Martori managed a male medical clinic in San Diego.

31. Mr. Martori interested Mr. Wheatcraft in the business, allowed him to visit the San Diego clinic and ask questions about its business, and then later introduced him to UMI (a few months before September 2010).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  EDCV 13-00199 SJO (OPx)          DATE:  December 16, 2014

32.  On September 16, 2010, Todd Wheatcraft emailed Jeffrey Fromberg "a list of the names of people participating in the Chicago clinic to get the agreement started."

33.  Prior to entering into the Consulting Agreement, Messrs. Wheatcraft, Bertoncino and Shapiro each spoke to Mr. Martori concerning the operation of Martori's male medical management business.

34.  Jarrett Annenberg, a "tenant's representative" involved in the lease CMMC was negotiating with a landlord requested that Fromberg provide a pro forma.

35.  In response, Mr. Fromberg "hastily" prepared a document for the purpose of obtaining a real estate lease, which he forwarded to Todd Wheatcraft to send on to CMMC's tenant representative, if Mr. Wheatcraft "approve[d] of it".

36.  The October 25, 2010 Fromberg email states as follows:

> Todd:
> Your tenant representative, Jarrett Annenberger contacted me to get proforma for the Chicago Male Medical Center. I put one together hastily.
> This is a proforma financial statement for the proposed 5,800 square foot Chicago office for 12/1/10 to 11/30/11. I prepared it based upon the Los Angeles Clinic's operating data. I would think that Chicago will be similar to Los Angeles in how one might expect it will perform if properly managed and marketed. Of course, as we have previously discussed, the amount of business is often directly related to the amount of effective marketing. The figures are only estimated, and, of course, the amount of resales of medications increase as the number of patients increases with time. The medication resales become more prominent by the month, starting very small and slowly, and increasing as each month passes.
> I believe that this what Jarrett had in mind to present to the landlord. Jarrett Annenberg's email address is: Jarrett.annenberg@CBRE.com. If you approve of it, please send it to him right away.

37.  In the Pro Forma, UMI and Fromberg made projections as to income and expenses that CMMC might experience in the operation of their proposed Chicago clinic.

38.  The Pro Forma given to CMMC was an extrapolation based on the existing Los Angeles Clinic's operating data.

39.  CMMC decided to pursue its business based upon the performance of Fred Martori's San Diego clinic.  At the time the Pro Forma was prepared, CMMC had already decided to enter the

Case 5:13-cv-00199-SJO-DTB   Document 163   Filed 12/16/14   Page 7 of 16   Page ID #:5215

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.: <u>EDCV 13-00199 SJO (OPx)</u>   DATE: <u>December 16, 2014</u>

business. CMMC had already negotiated a $300,000 payment to UMI and was attempting to lease real estate for the business in a specific building in Chicago.

40. In September 2010, there was a meeting attended by Todd Wheatcraft, Jeffrey Fromberg, Larry Berry, and Roy Castner, among others. There were no substantive discussions regarding revenue numbers at the September meeting.

41. In making its decision to invest and to sign the Consulting Agreement, CMMC did not rely on any projection from UMI that the Chicago marketplace would deliver $4 million in annual revenue, or on any discounted version of that figure.

42. UMI did not represent to CMMC that a secret formula of medication would be provided.

43. UMI's call center was a bilingual call center dedicated to only a few male medical clinics. It was not operated or intended to be operated at a profit.

44. Plaintiff did not rely on any representation that the call center was not for profit in entering into the Consulting Agreement.

45. There is not sufficient credible testimony to show that CMMC underreported its earnings to UMI.

46. There is not sufficient credible testimony to show that either UMI's methods of radio advertising or UMI's dosing of tri-mix medication were secrets with independent economic value or that UMI went to efforts to maintain their secrecy.

47. There is not sufficient credible testimony to show that CMMC continued to use or disclose UMI's confidential information after CMMC began to operate independently of UMI and NMMC.

III.   <u>CONCLUSIONS OF LAW</u>

The Court makes the following Conclusions of Law. If any of these conclusions of law also constitute findings of fact, the Court deems them findings of fact as well.

    A.   <u>Claim for Violation of Section 5 of the Illinois Franchise Disclosure Act</u>

In Count I, Plaintiff brings a claim for violation of Section 5 of the Illinois Franchise Disclosure Act ("IFDA"). This section provides a right to rescission when a franchisor fails to register its franchise with the State of Illinois or fails to deliver a disclosure statement. *See* 815 Ill. Comp. Stat. 705/5. Plaintiff claims that the Agreement between UMI and Plaintiff (1) prescribed or suggested a

Case 5:13-cv-00199-SJO-DTB Document 163 Filed 12/16/14 Page 8 of 16 Page ID #:5216

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

**CIVIL MINUTES - GENERAL**

CASE NO.: **EDCV 13-00199 SJO (OPx)**          DATE: **December 16, 2014**

marketing plan; (2) gave Plaintiff the right to use the name NMMC which included a trademark logo that Defendant Fromberg registered; and (3) required Plaintiff to pay UMI a substantial fee. Plaintiff argues that the Consulting Agreement was in fact a franchise agreement. Defendants, on the other hand, argue that the Agreement was not a franchise agreement at all, but rather a consulting agreement.

"A franchise is a set of contracts." *Al's Serv. Ctr. v. BP Products N. Am., Inc.*, 599 F.3d 720, 722 (7th Cir. 2010). Specifically, a franchise consists of a written or oral agreement under which: "(1) the franchisee is granted the right to engage in the business of offering, selling or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor"; (2) the operation of the franchisee's business is "substantially associated with the franchisor's trademark," and (3) the franchisee is "required to pay a franchise fee of $500 or more." *Peter v. Stone Park Enterprises, L.L.C.,* No. 98-C-1160, 1999 WL 543210 at *6 (N.D. Ill. July 23, 1999) (citing 815 Ill. Comp. Stat. 705/3). A franchise exists only if all three statutory elements are present. *Id.*

        1.        Marketing Plan or System

In order to demonstrate that the Consulting Agreement was a franchise agreement, Plaintiff must show that through the Consulting Agreement, it was granted the right to engage in the National Male Medical Clinic business under a marketing plan or system prescribed or suggested in substantial part by UMI. *See Peter*, 1999 WL 543210 at *6. Under the IFDA, a "marketing plan or system" is:

> a plan or system relating to some aspect of the conduct of a party to a contract in conducting business, including but not limited to (a) specification of price, or special pricing systems or discount plans, (b) use of particular sales or display equipment or merchandising devices, (c) use of specific sales techniques, (d) use of advertising or promotional materials or cooperation in advertising efforts; provided that an agreement is not a marketing plan or system solely because a manufacturer or distributor of goods reserves the right to occasionally require sale at a special reduced price which is advertised on the container or packaging material in which the product is regularly sold, if the reduced price is absorbed by the manufacturer or distributor.

815 Ill. Comp. Stat. 705/3(18). Note that the IFDA does not require that the marketing plan or system be binding on the party; rather, the system may be "suggested in substantial part by a franchisor. 815 Ill. Comp. Stat. 705/3.

In this case, it is clear that the Consulting Agreement provides for a "marketing plan or system" under the IFDA. Under the agreement, UMI is to provide telephone training for incoming calls,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** EDCV 13-00199 SJO (OPx)      **DATE:** December 16, 2014

suggested newspaper, magazine, circular, and radio ads, text for effective window signing, information and aid in setting up toll free telephone numbers, call center services, and other suggested marketing plans. (Consulting Agreement 2-4.) Thus, the Court concludes that the first prong of a franchise agreement under the IFDA is met.

    2.    <u>Brand Identification</u>

In order to demonstrate that the Consulting Agreement was a franchise agreement, Plaintiff must show that its business operations were substantially associated with the National Male Medical Clinic ("NMMC") trademark, trade name, logo type, advertising, or other commercial symbol. *See Peter*, 1999 WL 543210 at *6. Plaintiff argues that the Chicago clinic's inclusion on the National Male Medical Clinic website with the National Male Medical Clinic logo, and the similarity of the "Chicago Male Medical Clinic" name to the NMMC trademark, constitute association with the NMMC trademark.

Defendant argues that no franchise exists under the IFDA because any benefits to be derived from the use of the logos were not specifically mentioned in the contract, citing *Fosdick Poultry Processors, Inc., v. Eager*, 555 N.E.2d 62, 65 (Ill. App. 4th 1990). *Fosdick*, however, involved an "inconspicuous mark required by the government to designate the origin of a poultry product," as opposed to a large amount of specific advertising and branding. *Id.* In *Fosdick*, it was not clear that the use of a small, government-mandated mark was for the purpose of marketing the product, so the court was forced to turn to the contract to see if the parties had seen it as a marketing tool. Here, however, the advertising materials to be provided to Plaintiff were clearly for the purpose of marketing, so the contract need not specifically list benefits to be derived from them.

Extrinsic evidence, including parties' course of performance, can be used to determine the parties' intent under the Consulting Agreement. *See Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 877 F.Supp.2d 674, 691 (C.D. Ill. Jul. 12, 2012). Even if the specific branding to be used as part of advertising was not mentioned in the contract, the nature of the advertising materials provided can still be useful evidence in determining whether the Consulting Agreement was a franchise agreement.

The parties have stipulated that at the time the Consulting Agreement was negotiated, Jeffrey Fromberg was, on his own behalf, applying for protection of a trademark, National Male Medical Clinic. By the time the Consulting Agreement was executed, several months later, Jeffrey Fromberg personally had acquired and owned the National Male Medical Clinic trademark ("NMMC"). Trademark rights can accrue through use in commerce even without federal registration. *See* 15 U.S.C. § 1125(a)(1).

UMI's web site included the full name and logo that Defendant Fromberg had registered with the United States Patent & Trademark Office from and after on or about August, 2010. Defendants

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

**CASE NO.:** EDCV 13-00199 SJO (OPx)          **DATE:** December 16, 2014

intended to associate each clinic owned all or in part by Fromberg with the trademark. Initially, the trademark's appearance on the web site was for the following clinics: Dallas, Hawaii, Indianapolis, Los Angeles, Orange County, Miami, Nashville, Rancho Mirage, and Seattle. The Court has found that the Chicago clinic was later added to the website and displayed in a similar manner. This was sufficient to convey to the public that Plaintiff was affiliated with the National Male Medical Clinics brand. *Cf. Mechanical Rubber & Supply Co. v. American Saw & Mfg. Co.*, 810 F.Supp. 986, 991 (C.D. Ill. 1990).

Plaintiff was provided a logo using the same font, styling, and with the same caduceus symbol in the same positioning as NMMC and Los Angeles Male Medical Clinic. (Ex. 535.) This is further evidence that Plaintiff and Defendants intended to market all the clinics affiliated with UMI with a common brand.

Further, UMI's representative Mark Edelstein testified at his deposition that the Consulting Agreement provided Plaintiff the right to use the NMMC trademark. However, at trial Mr. Edelstein testified that his deposition testimony was incorrect. The Court was not persuaded by Mr. Edelstein's trial testimony.

Finally, the Consulting Agreement notes that employees might visit the "affiliated Los Angeles clinic" (Consulting Agreement 2), states that UMI is to provide suggested newspaper, magazine, circular, and radio advertising and assist in the negotiation of media contracts for CMMC (Consulting Agreement 3), states that UMI is to provide text for effective window signing (Consulting Agreement 3), and provides for the use of a centralized call center for advertising to potential customers (Consulting Agreement 4).

Given all these facts, the Court concludes that under the Consulting Agreement, Plaintiff's business operations were substantially associated with the National Male Medical Clinic ("NMMC") trademark, trade name, logo type, advertising, or other commercial symbol. The second factor for an Illinois franchise agreement is satisfied.

         3.      Payment of a Fee

In order to demonstrate that the Consulting Agreement was a franchise agreement, Plaintiff must show that CMMC was required to pay UMI a fee of $500 or more for the right to engage in business. *See Peter*, 1999 WL 543210 at *6. The parties have stipulated that the Consulting Agreement required CMMC to pay fees including a $300,000 initial cash payment, and that CMMC in fact paid fees to UMI in excess of $500.00. In return for this, Plaintiff received the right to engage in the National Male Medical Clinic business as discussed above. Thus, the third requirement is met. *See Cent. States Distrib., Inc. v. Minnesota Mining & Mfg. Co.*, 1997 WL 370191 at *6 (N.D. Ill. Jun. 27, 1997). Accordingly, the Court concludes that the Consulting Agreement was in fact a franchise agreement under Illinois law.

Case 5:13-cv-00199-SJO-DTB Document 163 Filed 12/16/14 Page 11 of 16 Page ID #:5219

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.: **EDCV 13-00199 SJO (OPx)**           DATE: **December 16, 2014**

4.      Defendants' "Sitting on its Hands" Defense

Defendant argues that Plaintiff has gained the benefit of "sitting on its hands," waiting to see whether the business venture was profitable, and then only demanding rescission when the venture turned out not to be. As a general rule under Illinois law, a party may not "pocket" a claim and wait to see whether the claim or the contract is more profitable. *See DeSantis v. Brauvin Realty Partners, Inc.*, 618 N.E.2d 548, 553 (Ill. App .1st. 1993). This defense, of course, only applies if Plaintiff knew of the IFDA claims in advance of the demand for rescission. This suit was filed August 15, 2011, roughly nine months after the Consulting Agreement was executed.

The question faced by the Court, then, is whether Plaintiff knew about the IFDA claims for a significant amount of time before filing the suit. Conflicting testimony was presented with regard to this issue. Mr. Cassell testified that Mr. Wheatcraft, owner of Plaintiff, stated three times in 2010 that "Uncle Brucey says this contract's illegal." (Nov. 20 Tr.) Mr. Wheatcraft testified that he made no such statements. (Nov. 21 Tr. 535:7-11.) Considering this testimony as a whole, the Court does not find it credible that Mr. Wheatcraft or Bruce Shapiro knew that the Consulting Agreement was in violation of the IFDA at the time. Accordingly, because there is no proof that Plaintiff knew of the IFDA claims, the Court concludes that Defendants' "sitting on its hands" defense fails.

5.      Rescission and Damages

The parties have stipulated that prior to the execution of the Consulting Agreement, Defendants did not register any franchise with the Illinois Attorney General's Office, and UMI did not provide Plaintiff with a disclosure document as defined in the Illinois Franchise Disclosure Act. Because the Consulting Agreement was a franchise agreement under Illinois law, this constitutes a violation of Section 5 of the IFDA. *See* 815 Ill. Comp. Stat. 705/5. Section 26 of the IFDA provides that "[a]ny person who offers or sells a franchise in violation of this Act is liable to the franchisee and the franchisee may sue either for damages or rescission." 815 Ill. Comp. Stat. 705/26. Rescission, in the IFDA context, "is defined as a party's unilateral unmaking of a contract for a legally sufficient reason." *Jensen v. Quik Intern.*, 820 N.E.2d 462, 466 (Ill. 2004) (citing Black's Law Dictionary 1332 (8th ed. 2004)). Further, "[e]very franchisee in whose favor judgment is entered in an action brought under this Section shall be entitled to the costs of the action including, without limitation, reasonable attorney's fees." *Id.* Thus, the Court concludes that Defendant UMI is liable for violation of Section 5 of the IFDA, and Plaintiff is awarded rescission.

Further, every principal executive officer or director of a liable corporation "is also liable jointly and severally with and to the same extent as such person, unless said person who otherwise is liable had no knowledge or reasonable basis to have knowledge of the facts, acts or transactions constituting the alleged violation." 815 Ill. Comp. Stat. 705/26. Defendant Jeffrey Fromberg was the sole owner/shareholder of UMI, and Fromberg was directly involved in the deal with Chicago

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.: **EDCV 13-00199 SJO (OPx)**               DATE: **December 16, 2014**

Male Medical Clinic. Thus, the Court concludes that Fromberg is jointly and severally liable with UMI.

With regard to the amount of damages, the Court awards Plaintiff the amount that was paid to UMI under the consulting agreement, namely, the initial $300,000 investment, plus the additional royalties of $56,251.92 that were paid under the Consulting Agreement. (*See* Ex. 542.) The call center fees of $45,437.50 are not awarded because the Consulting Agreement did not bind Plaintiff to use UMI's call center and because this was a direct payment for services rendered. Additionally, the Court awards Plaintiff reasonable costs and attorney's fees to be determined in a post-trial motion, as provided by statute.

  B. Fraud Claims

In Counts II and III, Plaintiff brings claims for violations of the anti-fraud provisions (Section 6) of the Illinois Franchise Disclosure Act and for common-law fraud. The relevant provisions state:

> In connection with the offer or sale of any franchise made in this State, it is unlawful for any person, directly or indirectly, to:
> (a) employ any device, scheme, or artifice to defraud;
> (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
> (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

815 Ill. Comp. Stat. 705/6. Further, Plaintiff must demonstrate that Plaintiff relied on UMI's material misrepresentations or omissions. (FPCO 9.)

In Illinois, "[t]he elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996).

As discussed in the previous section, the agreement between UMI and Plaintiff amounted to the sale of a franchise in Illinois. These claims, then, turn primarily on the questions of whether UMI made a false statement of a material fact and whether Plaintiff relied on such a statement. Plaintiff's claims focus primarily on the Pro Forma, but there are other allegedly false statements of material fact as well, and these will be addressed in turn.

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
Scan Only ___

CASE NO.: <u>EDCV 13-00199 SJO (OPx)</u>     DATE: <u>December 16, 2014</u>

    1.    <u>Pro Forma</u>

Plaintiff argues that the Pro Forma was a false statement of material fact and that Plaintiff relied on the Pro Forma in deciding to enter into its agreement with UMI.  The Court disagrees on both counts.  First, the email to which the Pro Forma was attached made clear that the Pro Forma contained "hastily" prepared, "estimated" projections.  Second, the Pro Forma was explicitly drafted for the purpose of helping Plaintiff obtaining a real estate lease.  Plaintiff should have expected that such projections would be optimistic; in fact, optimistic projections were in Plaintiff's interest in helping obtain the lease.  "A statement expressing an opinion or that relates to future or contingent events rather than to present facts, however, ordinarily does not constitute an actionable misrepresentation under Illinois law." *Bixby's Food Sys., Inc. v. McKay*, 193 F.Supp.2d 1053, 1062 (N.D. Ill. 2002) (internal quotation omitted).  Accordingly, the Court finds the projections in the Pro Forma were not a representation of preexisting material facts.

Plaintiff argues that since the Pro Forma was based on the data from the Los Angeles clinic, it was also a material omission not to explicitly state that it was an extrapolation.  There is no evidence to show that data from the Los Angeles clinic on which the Pro Forma was based was incorrect, however, and again the email was clear that the Pro Forma contained "estimated" projections.  Thus, the Court finds that this was not a material omission with respect to the Pro Forma.

Plaintiff's argument also fails with respect to reliance.  The Court finds that Plaintiff decided to pursue this business opportunity based upon Fred Martori's San Diego clinic, and due diligence would or should have been done with respect to that clinic.  At the point in time when the Pro Forma was provided, the $300,000 payment to UMI had already been negotiated, and Plaintiff was already serious enough about the investment opportunity to attempt to lease real estate at a specific site in Chicago.  Plaintiff should have known that projections are inherently uncertain, particularly an optimistic projection such as this one which noted that it was "hastily" prepared for the purpose of obtaining a real estate lease.  When a sophisticated plaintiff with relevant experience "closes its eyes to a manifest danger, suspicion arises that it wasn't actually fooled by the false representations of which it is complaining." *Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 646 (7th Cir. 2002) (citation omitted).  In this case, the Court concludes that Plaintiff did not reasonably rely on the representations in the Pro Forma in choosing to invest.

    2.    <u>Other Revenue Projections</u>

Plaintiff also argues that Defendant Jeff Fromberg and UMI affiliates Larry Berry and Roy Castner repeatedly claimed on Defendants' behalf that the Chicago marketplace should deliver $4 million in revenue.  (*See* Nov. 19 Tr. 57:25-58:8.)  The Court believes Jeff Fromberg's testimony that there were no substantive discussions regarding projected revenue numbers at the September meeting.  Even if these statements were in fact made, they were projections rather than assertions

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.: EDCV 13-00199 SJO (OPx)      DATE: December 16, 2014

of material fact, for the same reasons as the Pro Forma. Further, the Court finds it not credible that Plaintiff relied on these statements. Again, an experienced businessman such as Todd Wheatcraft should have taken this sort of statement with skepticism, as projections are inherently uncertain. While Mr. Wheatcraft claims to have taken off 20% and relied on a $3.2 million revenue figure, the Court does not find that reliance to be credible either. (Nov. 19 Tr. 58:25-59:4.) Plaintiff should have known that it is common for startup businesses to miss planned revenue by factors much greater than 20%, and that the assumptions based on which any such projection is made often turn out to be flawed by large margins. Accordingly, the Court concludes that these other alleged revenue projections do not amount to fraud.

        3.      <u>Secret Formula</u>

Another potential misrepresentation is that a secret formula of medication would be provided. The Consulting Agreement, however, appears to refer to dosing only. The Court does not find it credible that a secret formula of medication was to be provided or that Plaintiff relied on the provision of such a formula.

        4.      <u>Call Center</u>

Plaintiff finally argues that Defendants misled Plaintiff into believing that the call center was a service that would be provided to Plaintiff as part of the "consulting services" that Plaintiff was paying for, but in fact, the call center was operated or intended to be operated, at a profit. The Court finds that there has not been sufficient evidence to show that the call center was intended to be operated at a profit. Plaintiff argues that cheaper call center services were available from other providers. While this may be true, it is not sufficient to support a finding that UMI's call center was operating at a profit. UMI's call center was a bilingual call center dedicated to only a few male medical clinics. Other call center services might be shared or English-only, so their lower prices do not indicate that UMI's call center was operated at a profit. The Court concludes that there is not sufficient evidence to show that the call center was in fact operated or intended to be operated at a profit.

Further, specific call center rates were listed in the Consulting Agreement, and Plaintiff agreed to them. Whether these rates resulted in a profit to UMI was not material to the agreement. Finally, the Consulting Agreement explicitly states that the call center "is not operated *primarily* to maximize profits for itself," suggesting that profit may be a secondary motivation of the call center. (Consulting Agreement 4 (emphasis added).) Accordingly, the Court does not find it credible that Plaintiff relied on any representation that the call center was not for profit in entering into the Consulting Agreement. Plaintiff's fraud claims fail because the statements in question were not false statements of material fact and because Plaintiff did not rely on these statements.

    C.      <u>Counterclaims</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority
Send
Enter
Closed
JS-5/JS-6
Scan Only

CASE NO.: EDCV 13-00199 SJO (OPx)　　　　DATE: December 16, 2014

1. Fraud/Breach of Contract

Defendants allege that Plaintiff committed fraud, or alternatively breached the Consulting Agreement, by under-reporting its royalty numbers to UMI. In Illinois, "[t]he elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996). Similarly, under California law, the elements of a cause of action for fraud are: "(1) a misrepresentation, which includes a concealment or nondisclosure; (2) knowledge of the falsity of the misrepresentation, i.e., scienter; (3) intent to induce reliance on the misrepresentation; (4) justifiable reliance; and (5) resulting damages." *Small v. Fritz Companies, Inc.*, 30 Cal.4th 167, 173 (Cal. 2003).

Plaintiff responds the underreporting was very small and based on a representation by Mr. Cassell that Mr. Castner was OK with the underreporting because it only applied to customers who had come to the clinic through Mr. Wheatcraft's independently funded marketing aimed at the local police.

The Court heard significant evidence from Mr. Wheatcraft, Mr. Cassel, and Mr. Castner on this issue. The Court found credibility issues on both sides. Given the lack of credible testimony on this issue, the Court finds that Defendant has not met its burden of proof for Defendants' counterclaims. Thus, Defendant's counterclaims for fraud and breach of contract fail. Further, since these two claims fail, Defendants' request for accounting is also denied.

2. Trade Secrets

Defendants allege that Plaintiff disclosed and used their confidential information when Plaintiff joined the competition in violation of trade secret misappropriation laws. Under both California and Illinois law, a trade secret is information that (1) derives independent economic value from not being generally known to the public and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code § 3426.1(d); 765 Ill. Comp. Stat. 1065/2(d).

Defendants suggest that their methods of radio advertising are trade secrets. However, Defendants have not provided credible evidence that they went to efforts to maintain the secrecy of their methods of radio advertising (indeed, radio advertisements are inherently made public), or that Plaintiff continued to use Defendants' purportedly secret advertising methods after Plaintiff began operating independently of NMMC.

The other specific information that Plaintiff has suggested to be a trade secret is a particular dosing of tri-mix medication, and no credible evidence has been shown to support that this dosing

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:** <u>EDCV 13-00199 SJO (OPx)</u>          **DATE:** <u>December 16, 2014</u>

derived independent economic value from not being generally known to the public or that efforts had been taken to maintain its secrecy. Indeed, there is no reason to believe that any of the medications were trade secrets; they were probably patented drugs and fully disclosed in patents. Further, there is no credible evidence that Plaintiff continued to use or disclose Defendants' confidential information after Plaintiff began operating independently of NMMC. Accordingly, the Court concludes that Defendants' counterclaim for trade secret misappropriation fails.

IV.      <u>RULING</u>

The Court finds that Plaintiff established, by the preponderance of the evidence, that Defendants violated Section 5 of the Illinois Franchise Disclosure Act through the Consulting Agreement. The Court further finds that Plaintiff has failed to establish its other claims and that Defendants have failed to established their counterclaims by the preponderance of the evidence. Thus, it is **ORDERED, ADJUDGED and DECREED** that the Consulting Agreement is rescinded and that judgment is entered in favor of Plaintiff in the sum of $356,251.92 plus costs and attorney's fees to be determined in a post-trial motion. Plaintiff shall have until **December 29, 2014**, to submit a proposed judgment in accordance with this order.

IT IS SO ORDERED.